

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00489-CV

IN THE INTEREST OF S.I.H., A
CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In seven issues, appellant T.G. appeals the trial court's order terminating her parental rights to her son, S.I.H. (Steven).[2] She asserts that the trial court erred by admitting two exhibits and that the evidence is factually insufficient to support the trial court's termination decision. We affirm.

### Background Facts

During appellant's childhood in Nebraska, authorities removed her from her mother's care and placed her in foster care. She dropped out of high school

---

[1]*See* Tex. R. App. P. 47.4.

[2]Throughout this opinion, we will use "Steven" as an alias to refer to S.I.H. *See* Tex. R. App. P. 9.8(b)(2).

when she was a sophomore. Since then, including Steven, appellant has birthed eleven children. At the time of Steven's termination trial in November 2011, when appellant was thirty-nine years old, none of the children were in her possession. Before the trial court terminated appellant's parental rights to Steven, other courts had terminated her rights to nine of her other children.[3]

Appellant gave birth to Steven in February 2008; according to appellant, Steven had no special medical conditions at that time.[4] Sometime between Steven's birth and June 2010, Child Protective Services (CPS) personnel attempted to investigate matters related to Steven's care, but they were unable to do so because they could not locate appellant. Appellant began living with Jacqueline Ward in 2009. In 2010, when Steven was two years old, appellant left him with Ward. According to Nikki Lepori, a CPS investigator, appellant did so to go "off with a boyfriend somewhere"; according to appellant, she did so to seek a house and a job. Appellant says that Ward volunteered to keep Steven and that appellant left contact information that Ward could use in the event of an emergency.

Because of a concern that Steven had been abandoned, CPS removed him from Ward's care, and on June 1, 2010, the Department of Family and

---

[3]During the course of Steven's case, appellant became pregnant and had a child in Nebraska. The termination of appellant's rights to her eleventh child was pending at the time of the trial concerning Steven.

[4]Steven's father (Father), with whom mother apparently had a common law marriage, died in October 2011.

Protective Services (the Department) filed a petition that sought termination of appellant's parental rights to Steven if reunification could not be achieved.[5] Ward told CPS that she was unable to care for Steven because she had psychotic issues; she explained that she had post traumatic stress disorder, a substantial history of drug abuse, and "many suicide attempts." The Department attached an affidavit to its petition that detailed appellant's CPS history. The trial court appointed the Department as Steven's temporary sole managing conservator and set an adversary hearing concerning Steven's removal.[6]

When CPS removed Steven from Ward's home, he had a normal weight, but he was "significantly delayed." His head was flat on one side and looked "grossly misshapen" to Lepori. Lepori arranged for Steven to be diagnosed at a children's hospital. While they were there, Lepori and another investigator were able to play with Steven; they sang to him while he learned the song, danced, and smiled, which indicated to Lepori that he could learn but had been severely neglected. Lepori testified that a doctor diagnosed Steven to be suffering from severe neglect.

At the time of Steven's removal, a night intake worker attempted to locate appellant but was unable to do so. Although CPS later found appellant and

[5]Appellant testified that she left Steven with Ward for "about two weeks." She said that Ward eventually expressed that she could not keep Steven, and although appellant gave Ward a list of names of people who might be able to care for him, Ward "turned around and lied . . . and she called CPS."

[6]See Tex. Fam. Code Ann. § 262.201 (West Supp. 2011).

served her with notice of Steven's removal, she did not appear at the adversary hearing or some out-of-court meetings concerning Steven. Lepori eventually spoke with appellant, and appellant could not name all of the children she had birthed. Appellant told Lepori that she could not visit Steven because she was busy. CPS eventually placed Steven with C.D., Steven's paternal aunt (Aunt).

Following the adversary hearing in June 2010, the trial court granted appellant visitation of one hour per week with Steven. The court also ordered appellant, under section 263.106 of the family code,[7] to comply with each requirement of the Department's service plan. The Department's July 2010 service plan required appellant to maintain monthly contact with the department; complete a psychological evaluation, a drug and alcohol assessment, and parenting classes; participate in individual counseling; and maintain suitable housing.

According to Matthew Reed, the CPS caseworker assigned to Steven's case at the time of the trial, appellant called him on a quarterly basis, and during those conversations, she did not ask how Steven was doing.[8] Appellant did not maintain contact with Steven (she did not visit him after January 2011, although she asked to do so in the fall of 2011). Appellant completed a psychological

---

[7]*See* Tex. Fam. Code Ann. § 263.106 (West Supp. 2011).

[8]Appellant disagreed with Reed's testimony that she only contacted him once every several months. Instead, appellant testified that she tried to contact him "every single day" and left messages for him.

4

evaluation and parenting classes, but she did not complete counseling because she failed to regularly attend. She also failed to take the drug and alcohol assessment or to maintain stable housing. The psychological evaluation revealed that appellant has an IQ of approximately seventy-five and suffers from depression. Appellant said that CPS personnel lied to her by telling her that they would get her into drug and alcohol treatment, although she denied needing the treatment. She testified that although she tried to get to counseling on time, she could not do so because she did not have money for public transportation, and walking to counseling could not "cut it when you're way on the other side of town."[9] Although appellant sought counseling at another location, it was too expensive, so she quit going.

At times, appellant was homeless, and at other times, she stayed with friends. She would not give Reed the addresses of places she was living. Appellant did not have a driver's license, and she told Reed that she walked "pretty much everywhere she [went]."

Reed watched appellant's visit with Steven in January 2011, and Reed noticed that appellant had "very little contact" with Steven. She sat on the couch while Steven played on the floor, and she talked to him sparsely. These actions were similar to how appellant had acted in previous visits with him. Reed never

---

[9]The record reflects that appellant lived approximately seven blocks from where the counseling sessions were scheduled. Appellant arranged to get from Texas to Nebraska by a bus to birth another child although she denied having $2 or $3 for a round trip on public transportation to attend counseling.

heard Steven refer to appellant as his mother, and he never saw any attachment between Steven and appellant although Steven had formed attachments with other people, including Reed. According to Reed, appellant missed her weekly visits with Steven after January 2011 because she "was busy, she had a job interview, or she didn't have transportation." He said that he attempted to persuade appellant to use public transportation and that she had enough advanced notice of the visits that she could have walked to them.

The trial of the Department's termination petition occurred in November 2011. At the end of the trial, the trial court found that appellant had knowingly placed or knowingly allowed Steven to remain in conditions that endangered his physical or emotional well-being, engaged in conduct or knowingly placed Steven with persons who engaged in conduct that endangered his physical or emotional well-being, constructively abandoned him, and failed to comply with the provisions of a court order that specifically established the actions necessary for Steven to be returned to her. The trial court also found that termination of appellant's rights was in Steven's best interest, and it therefore terminated her rights. Appellant brought this appeal.

### Factual Sufficiency

In her third through seventh issues, appellant argues that the evidence is factually insufficient to support the termination of her parental rights to Steven. A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property

6

right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened

7

standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In reviewing the evidence for factual sufficiency, we must give "due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* at 266. We do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent committed an act listed in section 161.001(1) and that the termination of the parent-child relationship is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Termination under section 161.001(1)(E)**

Among three other conduct-based grounds, the trial court terminated appellant's parental rights on the basis that she engaged in conduct or knowingly placed Steven with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). Appellant challenges this basis for termination in her fourth issue.

8

As we have recently explained,

> Endangerment means to expose to loss or injury, to jeopardize. Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act. Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. Moreover, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth.

*In re M.E.-M.N.*, 342 S.W.3d 254, 261–62 (Tex. App.—Fort Worth 2011, pet. denied) (citations omitted).

Significant evidence supports the trial court's endangerment finding. The record establishes that Steven had developed physical problems while in appellant's care because of her neglect. According to Lepori, upon Steven's removal in the middle of 2010, his head was "very, very misshapen." Lepori testified that Steven appeared to be severely neglected. She said that a doctor diagnosed the head issue to be caused by the neglect. Although Lepori did not know whether Steven's head was misshapen at his birth, when she saw him sometime after his removal, it "looked much more normal," which indicated to her that the misshaping was caused by neglect and was not a deformity. Also, Steven had "drooping" on the left side of his face and tooth decay, which the

9

Department attributed to neglect, apparently based on diagnoses the Department received. Reed testified that a child's teeth may erode when the child is allowed to suck on a bottle too much. The trial court could have justifiably based its endangerment finding on Steven's physical issues at the time of his removal. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (holding that physical neglect may support an endangerment finding because neglect "can be just as dangerous to the well-being of a child as direct physical abuse"); *In re T.T.F.*, 331 S.W.3d 461, 483–84 (Tex. App.—Fort Worth 2010, no pet.) (concluding that a parent's medical neglect supported a trial court's finding under section 161.001(1)(E)).

After Steven's removal, he had significant developmental delays, and he had to wear a helmet because he would "throw tantrums and bang his head on the floor"; at the time of trial, after being removed from appellant's care for an extended period, Steven was no longer throwing such tantrums. Steven's apparent emotional issues that he developed while in appellant's care also support the trial court's endangerment finding. *See* Tex. Fam. Code Ann. § 161.001(1)(E).

Appellant's leaving Steven with Ward also supports the trial court's finding under section 161.001(1)(E). When Lepori spoke to appellant after Steven's removal, appellant asked Lepori whether Steven had "any hand prints on him." According to appellant, she did so because she assumed that he could have been removed for physical abuse. But Lepori testified that appellant asked about

10

the hand prints because appellant "said she didn't trust Ms. Ward. She said she'd had previous concerns with the way Ms. Ward treated [Steven]." In fact, Lepori testified that appellant conveyed to her that Ward had once tied Steven to a car seat so that he could not get out. Appellant's testimony indicated that Steven's being constrained to a car seat for periods of time within his home occurred more than once, although it is unclear when appellant became aware of these events.

Appellant's leaving Steven with Ward prompted his removal. Ward admitted to having psychotic issues, a substantial history of drug abuse, and several suicide attempts. According to Lepori, Ward indicated that appellant knew about Ward's psychotic issues. When Ward informed appellant that Ward could not care for Steven, appellant did not return to care for him or ensure that someone else could do so; rather, by her own testimony, appellant told Ward only to get names off of a light switch of people that could care for him.

Next, more than a year after Steven's removal, appellant still could not offer him stable housing or reliable transportation; she recognized that she was not prepared to take him home. The trial court could have relied on these facts to find endangerment. *See In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at *8 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (upholding a finding of endangerment when the father was, among other things, unable to provide stable housing and financially unable to care for his children); *see also In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)

11

(explaining that conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child). Appellant's employment history (or lack thereof) also casts doubt concerning her ability to adequately provide for Steven, which factors into our review of the trial court's endangerment finding. *See In re H.N.H.*, No. 02-11-00141-CV, 2012 WL 117861, at *25 (Tex. App.—Fort Worth Jan. 12, 2012, no pet.) (mem. op.) (considering a mother's ability to provide financially for her children as a factor under section 161.001(1)(E)); *In re M.N.G.*, 147 S.W.3d 521, 538–39 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (holding similarly).

Finally, appellant's failure to attempt to visit Steven for several months during the pendency of this case supports the trial court's finding of endangerment of Steven's emotional well-being. *See In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). When Reed, who has a master's degree in social work, was asked how a parent's lack of contact with a child affects the child, he testified, "It's a huge impact. You know, children thrive on consistency. And if they don't have that, especially something as important as their parental relationship, it can be very damaging."

We recognize that some evidence weighs against the trial court's finding under section 161.001(1)(E). Appellant said that while she cared for Steven, she took him to visit doctors. She testified that the doctors never said anything about neglect and that Steven was current on his shots. Although appellant noticed

12

that Steven's head was misshapen, she said that a doctor expressed that nothing was wrong with the head. She testified that she was planning on getting another diagnosis for the misshaping of Steven's head but that CPS removed him from Ward's care before appellant could do so. As appellant notes in her brief, the Department did not present expert testimony concerning Steven's head deformity and did not call a doctor to testify that Steven's physical and emotional issues had resulted from neglect.

Also, at trial, the Department did not produce medical records verifying Ward's psychotic issues. Appellant denied that she knew about the issues, and she said that she did not have concerns about Ward's ability to care for Steven.

Although some conflicts arise from the evidence and inferences at trial concerning appellant's degree of responsibility for Steven's physical and emotional issues and concerning appellant's knowledge about Ward's psychological problems, we must give due consideration to evidence that the factfinder could have found to be clear and convincing, and we must generally leave the resolution of those conflicts to the factfinder. *See J.F.C.*, 96 S.W.3d at 266; *T.T.F.*, 331 S.W.3d at 484. Despite the conflicting evidence, we conclude that the trial court could have reasonably formed a firm belief or conviction that appellant engaged in conduct or knowingly placed Steven with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *M.E.-M.N.*, 342 S.W.3d at 261–62. Thus, we hold that the evidence is factually sufficient to support the trial court's finding

under section 161.001(1)(E), and we overrule appellant's fourth issue. Because only one finding under section 161.001(1), along with a finding of the child's best interest, is sufficient to support termination, we decline to address appellant's third, fifth, and sixth issues, which challenge the trial court's findings under section 161.001(1)(D), (N), and (O). *See* Tex. R. App. P. 47.1; *In re Z.C.*, 280 S.W.3d 470, 475 n.22 (Tex. App.—Fort Worth 2009, pet. denied); *In re K.A.S.*, 131 S.W.3d 215, 225 (Tex. App.—Fort Worth 2004, pet. denied).

**Steven's best interest**

In her seventh issue, appellant argues that the evidence is factually insufficient to prove that termination of her parental rights to Steven is in his best interest. *See* Tex. Fam. Code Ann. § 161.001(2). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the factfinder may use in determining the best interest of the child in a termination case include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may

14

indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Steven did not verbally express a desire about the termination of appellant's parental rights The evidence, however, shows that he struggled physically and emotionally at the time of his removal from appellant's care but prospered after his removal. After the Department removed Steven, it took him to several doctors and dentists and arranged for him to have a psychological evaluation. At the time of the trial, he was receiving speech therapy and physical therapy in school. He no longer had to wear a helmet because he had stopped having tantrums. He had also made "developmental strides." At the time of the trial, Steven was three years old. Reed testified that Steven was a "great little boy" and was very affectionate. Although Steven was verbally delayed, he had made "great improvements" since his removal and his placement with Aunt. Aunt, who stayed home but whose husband was employed, wanted to adopt Steven.

As we have explained above, appellant did not comply with her service plan, and by her actions, including her failure to visit Steven for an extended

15

period, she seemed to show disinterest in obtaining Steven's return to her care. Appellant said that she did not visit Steven because "as a mother it is stressful, and it's hard on a parent to see your kid not getting that bonding with you. And it's hard for a parent to be there, seeing your kid avoiding you." Appellant did not know if Steven avoided her because he did not care about her or because he just wanted to play. Appellant admitted, however, that she could have "[r]esponded . . . better to him." In contrast to appellant's few visits with Steven, Aunt testified that appellant visited Father regularly when he was in a nursing home.

As opposed to appellant's lack of a bond with Steven, Reed testified that Steven had bonded with Aunt and with another child who lived in Aunt's home. Reed opined that Aunt could take care of all of Steven's needs and that Steven should live with her on a permanent basis through adoption. Aunt testified that in the eight months that Steven had been in her home, he had brought joy to her life, and she had met his educational and medical needs. During that time, appellant had never helped her care for Steven and had not sent him any cards or gifts. Appellant said that she did not call Aunt to check on Steven because she and Aunt were "not on speaking terms." Appellant recognized that Aunt had met Steven's needs and could continue to do so in the future, and she said that she appreciated Aunt for caring for Steven.

Next, although more than a year had passed since Steven's removal, appellant was not prepared for his return to her care even if the trial court had not terminated her rights. Appellant stayed with a friend in Weatherford from July

16

2010 until February 2011. After the friend kicked her out, she stayed at a shelter in Azle until April 2011, but she failed to keep requirements of the shelter and got kicked out there, too. She became homeless and lived "on the streets" awhile before living in a house with another friend. Appellant testified that her November 2010 application for government housing had been denied because of her "prison status" (she had served time for possessing a controlled substance). However, she said that she reapplied for such housing in October 2011.

Appellant testified that she was trying to get a GED, and she said that during the pendency of Steven's case, she applied for jobs at McDonald's, motels, and nursing homes. She eventually started working for an in-home healthcare company in Stephenville. According to appellant, she was employed from August 2011 until the trial in November 2011, at which time she was making $8.50 per hour and working "52 hours to 80 hours a week." But before appellant obtained that job, it had been about eight years since she had worked full time. Appellant said that she was trying to obtain a car, although her driver's license had been suspended since 2001 and although she needed to pay $1,500 for it to be reinstated. She did not have health insurance at the time of the trial, and she received food stamps.

Appellant conceded to having a long history with CPS, but she said that the reports of neglect of her children have been "based on lies." Nonetheless, the termination of her rights to nine other children casts doubt on her ability to effectively parent Steven. Appellant agreed that at the time of the trial, she was

17

not able to take Steven home with her, but she asked the court to name her a possessory conservator so she could continue to have access to him. She said that it was not in Steven's best interest for the trial court to terminate her parental rights because doing so would "mess him up totally" and "brainwash him" to treat her unkindly later in his life. She explained, "It's not fair for a child to grow up without at least one of the parents involved in [his] life."

Lepori opined that appellant had left Steven with an inappropriate caregiver when she allowed Ward to possess him. When Reed was asked whether appellant was able to meet Steven's needs, he responded, "Absolutely not." Reed testified that he would be concerned if Steven went home with appellant. He also opined that appellant had not demonstrated an ability to provide Steven with a safe environment. Aunt said that in the time she has known appellant, she had not seen appellant demonstrate an ability to parent a child, and Aunt believed that appellant's presence in Steven's life was disruptive. Jesus Nevarez, appellant's guardian ad litem (who is also an attorney), expressed his belief that appellant could not appropriately parent Steven and that Steven would not be safe with appellant if appellant did not have a home. Nevarez believed that appellant understood the consequences of not cooperating with CPS and completing her service plan.

Applying all of these facts and the other facts recited above to the *Holley* factors, we hold that the trial court could have reasonably formed a firm belief or conviction that termination of appellant's parental rights is in Steven's best

interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Holley*, 544 S.W.2d at 371–72; *see also R.R.*, 294 S.W.3d at 237 (explaining that a father's difficulty maintaining safe and stable housing, his inconsistent employment history with no guaranteed income, and his inappropriate choices that put his children in danger all demonstrated that it was in the children's best interest that the father's parental rights be terminated). We overrule appellant's seventh issue.

**The Trial Court's Admission of Two Exhibits**

In her first two issues, appellant argues that the trial court erred by admitting two exhibits into evidence. Near the beginning of the trial, the Department introduced certified copies of affidavits of voluntary relinquishment that Father and appellant had executed with respect to one of appellant's children, J.D.L.C., in March 2005. Appellant objected to the admission of the documents on the ground of relevance, but the trial court admitted them.

For error to be reversible in a civil case, the error must have probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting a case to a court of appeals. Tex. R. App. P. 44.1(a). Error in the admission of evidence is generally harmless when the objecting party allows other evidence of the same or similar facts to be admitted without an objection. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004); *In re M.H.*, 319 S.W.3d 137, 148 (Tex. App.—Waco 2010, no pet.); *In re S.B.*, 207 S.W.3d 877, 883 (Tex. App.—Fort Worth 2006, no pet.).

19

Along with the affidavits of relinquishment, the Department introduced an order terminating appellant's and Father's rights to J.D.L.C. Appellant did not object to the admission of the order, which recited that appellant and Father had relinquished their rights, stated that they had endangered and had constructively abandoned J.D.L.C., and explained that termination of their rights to J.D.L.C. was in his best interest. Also, appellant did not object to the admission of Nebraska orders of termination for six more of her children.

Because appellant failed to object to evidence that contained the same information that the objected-to evidence conveyed (appellant's and Father's voluntary relinquishment of their parental rights to J.D.L.C.), we hold that any potential error of the trial court in admitting the affidavits of voluntary relinquishment is harmless. *See* Tex. R. App. P. 44.1; *S.B.*, 207 S.W.3d at 883. We overrule appellant's first two issues.

## Conclusion

Having overruled all of appellant's dispositive issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DELIVERED: March 15, 2012

20